IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


DEBORAH MILLER, PERSONAL
REPRESENTATIVE OF THE ESTATE OF
RAY A. MILLER,

                                        Plaintiff,

                    v.

MULTNOMAH COUNTY; DR. AMIT SHAH,
personally and in his official capacity; JUDY
ARMSTRONG; JACKIE SINCLAIR; and
HELEN BLASKO,

                            Defendants.

3:11-cv-1168-AC

FINDINGS AND RECOMMENDATION

ACOSTA, Magistrate Judge:

*Pending Motions*

Deborah Miller ("Miller"), acting as the personal representative for the Estate of Ray A.

Miller, filed an Amended Complaint against Multnomah County, Dr. Amit Shah ("Shah"), Judy

1 – FINDINGS AND RECOMMENDATION

Armstrong ("Armstrong"), Jackie Sinclair ("Sinclair") and Helen Blasko ("Blasko") (collectively "County"), alleging claims under federal and state law arising from the 2010 death of Ray A. Miller while he was being held at the Multnomah County Detention Center. Specifically, Miller alleges three claims under 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments, and state common law claims for medical negligence, intentional infliction of emotional distress and wrongful death. Miller seeks monetary and declaratory relief, including punitive damages and attorney fees and costs.

The County filed a Motion for Summary Judgment seeking an entry of judgment against all claims in Miller's Amended Complaint. Oral argument was heard on the motion and, for the reasons that follow, the County's Motion for Summary Judgment should be granted.

*Background*

In early 2010, Dr. Jeffery Young, Ray Miller's primary care physician, prescribed Toprol XL, for morning and evening use, to treat an emerging heart condition. (Dr. Jeffrey Young Decl. ¶ 2, May 20, 2013.) The Toprol XL insert containing the prescribing information expressly warns against the dangers of abrupt cessation. (Leonard R. Berman Decl. Ex. 9, Sept. 30, 2013.) Specifically, there are two-boxed warnings, including: "WARNING: ISCHEMIC HEART DISEASE . . . Following abrupt cessation of therapy with beta-blocking agents, exacerbations of angina pectoris and myocardial infarction have occurred . . . ." (Berman Decl. Ex. 9, at 1.) On the morning of August 3, 2010, Deborah Miller witnessed her husband, Ray Miller, take his medications. (Deborah Miller Decl. ¶ 2, Aug. 19, 2013.) Later that same day, Ray Miller was arrested by Portland police officers for Menacing, Reckless Endangerment and Unlawful Discharge of a Firearm. (Susan M. Dunaway Decl. Ex. 9, Aug. 26, 2013.)

2 – FINDINGS AND RECOMMENDATION

At the time of his arrest, Miller had a laceration on his lip so the Portland police officers transported Miller to Portland Adventist Hospital ("PAH") prior to his booking at the Multnomah County Detention Center ("MCDC"). (Dunaway Decl. Ex. 9, at l, 3-4.) At PAH, Miller was interviewed by an emergency room nurse. (Dunaway Decl. Ex. 4, at 1-6.) Miller reported he presently taking only two medications, acetaminophen-hydrocodone (Vicodin) and duloxetine (Cymbalta). (Dunaway Decl. Ex. 4, at 1; Amit Shah Decl. ¶ 4, Aug. 26, 2013.) Nevertheless, Toprol XL was referenced in the nurse's notes from August 3, 2010. (Young Decl. ¶ 4.) Hospital records from the August visit also show notes from prior visits by Miller to the hospital on and between September 29, 2009, and October 1, 2009. (Dunaway Decl. Ex. 4, at 1, 4-6; Joaquin Emeterio Gonzalez Cigarroa Decl. ¶¶ 5-6, Aug. 26, 2013.) During those prior visits, Miller was treated for heart palpitations and hypokalemia (low potassium), and was placed on medication, including Toprol XL and potassium. (Cigarroa Decl. ¶¶ 5-6.) On the August 3, 2010 visit, a PAH nurse recorded Miller's vital signs, including his blood pressure (155/97) and respirations (16). (Dunaway Decl. Ex 4, at 1; Shah Decl. ¶ 6.)

The PAH nurse also recorded the results from the Glasgow Comma Test. (Dunaway Ex. 4, at 6.) The Glasgow Comma Test is a neurological scale used primarily by paramedics, nurses and doctors to gauge the conscious state of a patient. (Shah Decl. ¶ 5.) On a scale of 1-15, with 15 being the most conscious and fully awake patient, Miller scored a 15. (Shah Decl. ¶ 5; Dunaway Decl. Ex. 4, at 2.) While at the hospital Miller's lip was sutured and he was given instructions to follow-up with his primary care doctor in seven days, but there were no instructions given to Miller regarding any other health condition, specifically no instructions regarding blood pressure medications. (Dunaway Decl. Ex. 4, at 6-9.)

3 – FINDINGS AND RECOMMENDATION

After he was treated for his lip injury, Miller was taken by Portland police to MCDC and booked into custody. (Dunaway Decl. Ex. 16.) Upon his arrival and booking, Miller was evaluated by an intake nurse who, like the PAH nurse, observed Miller was highly conscious, noting he was alert, oriented times three, cooperative, relaxed, and neat. (Shah Decl. ¶ 5; Dunaway Decl. Ex. 5, at 1.) Regarding present medications, Miller reported to the jail nurse the same medications he reported to the PAH nurse – Vicodin and Cymbalta. (Shah Decl. ¶ 4; Dunaway Decl. Ex. 5, at 1.) When asked by the intake nurse about physical and mental health problems, Miller did not report any cardiovascular problems, rather he described psychological, musculoskeletal, and skin problems. (Jeannie Chesney Decl. ¶ 5, Aug. 26, 2013; Dunaway Decl. Ex.5, at 2.) The nurse told Miller to put in a medical request form ("MRF") for his medications and to follow-up in a week for his lip wound. The jail nurse also noted Miller was "knowledgeable of health condition. Appears otherwise healthy." (Dunaway Decl. Ex. 5, at 2.)

The MCDC intake nurse did receive an oral report from the nurse at PAH regarding Miller. (Dunaway Decl. Ex. 5, at 3.) When a provider gives an oral report to another provider, the practice in the medical field is to communicate all serious medical conditions. (Shah Decl. ¶ 6; Chesney Decl. ¶¶ 6-7.) It is also a general practice for the receiving provider to rely upon the accuracy and completeness of the oral report provided. (Shah Decl. ¶ 6; Chesney Decl. ¶¶ 6-7.) The PAH nurse gave the jail nurse Miller's vital signs and the follow-up instructions for the stitches in his lip, but did not reference any cardiovascular condition or medications, although she conveyed Miller took Vicodin for pain. (Shah Decl. ¶ 6; Chesney Decl. ¶¶ 6-7.) In accordance with general medical practices and procedures, if there had been a concern at the hospital about Miller's blood pressure, the PAH nurse would have reported that concern to the jail nurse. (Chesney Decl. ¶ 7.) In a jail

setting a BP reading of 155/97, without other signs, is not considered a cause for alarm because the fact of arrest and booking raises blood pressure. (Chesney Decl. ¶ 7.)

The County's Hypertension Program mandates, however, inmates with a blood pressure reading above 140/90, be checked regularly and entered into a hypertension monitoring program. There is no record this occurred in Miller's case. (Berman Decl. Ex. 11.) In fact, based upon the progress notes from the MCDC intake nurse, there was no follow-up blood pressure measurement, no entry into the hypertension program, and no notification of the on-call physician regarding Miller's blood pressure reading of 155/97. (Berman Decl. Ex. 6.)

Miller, however, provided a statement from a "nursing expert" Shasha Alsdorf, R.N., that contradicts the County's assertion that all pertinent information had been communicated. Specifically, Nurse Alsdorf stated:

> 4.      He was seen at PAH emergency the night of August 3, 2010, and Toprol was mentioned in the nurse notes. This information could and should have been requested and FAXED to the MCDC nursing the morning of August 4, 2010.
>
> . . . .
>
> 6.      Continuity of Care standards dictate that a patient entering a facility from a hospital or ER must timely access the ER records and forward them to the facility physician for review to guarantee proper treatment and medication maintenance for patients.

(Shasha Alsdorf, R.N., Decl. ¶¶ 4, 6, May 13, 2013.) In her review of the jail records, Alsdorf notes Miller requested his "heart meds" the evening of August 4, 2010, yet there is no evidence of any inquiry for those medications. (Alsdorf Decl. ¶ 14.) Based upon her review of the medical records and pharmaceutical literature, and her training, in Alsdorf's view, Miller's death was due to the abrupt cessation of his Toprol XL and K-Dur while in the County's custody. (Alsdorf Decl. ¶ 16.)

5 – FINDINGS AND RECOMMENDATION

In addition, a MCDC staff physician, Dr. Ole Ersson did acknowledge that when getting a complete list of medications from an intoxicated or impaired individual, the "best care" might be for the emergency department to fax a report to the jail. (Berman Decl. Ex. 12 (Dr. Ole Ersson Dep. 4:1-16, March 18, 2013).)

In her Declaration, Deborah Miller stated she spoke, by phone, with "corrections officials Melleck, Heidenreich and later others, at about 9:00 a.m. on August 4, 2010[,]" to inform them her husband "desperately needed his heart medications[.]" (Miller Decl. ¶ 7.)  According to her statement, a corrections official called Deborah Miller "that afternoon to reassure [her] . . . they were investigating his medications."  (Miller Decl. ¶ 7.)  In addition, Deborah Miller stated in her deposition that her husband called her from jail to ask about his heart medication and whether Deborah told anyone about the medication. (Dunaway Decl. Ex. 22 (Deborah Miller Dep. 48:1-7, Aug. 15, 2012 (hereinafter "Miller Dep.")).)  Deborah Miller testified that during the same phone call Miller stated to her: "he told them that he needed his heart medication." (Miller Dep. 48:3-4.) The transcript from that call, however, does not support these allegations by Deborah Miller. (Dunaway Decl. Ex. 21.)

While in booking, Miller was also seen by a classification deputy to determine, among other things, whether he posed any physical or mental health concerns. (Derrick Peterson Dec. ¶ 6, Aug. 26, 2013; Dunaway Decl. Ex. 15, at 2.) According to the "Classification Summary Report," Miller identified only his fused back as a serious medical issue. (Peterson Decl. ¶ 6; Dunaway Ex. 15, at 2.) The County contends Miller did not report any serious medical problems and, consequently, he was not housed in a medical unit. (Peterson Decl. ¶ 6.)

6 – FINDINGS AND RECOMMENDATION

Around 4:00 a.m. on August 4, 2010, Miller was moved to housing unit 5A, where he remained until 8:00 p.m. (Peterson Decl. ¶ 5; Dunaway Ex. 9, at 1-3, Ex. 16.) During that time, nurses were in the module three times, but there is no record Miller talked to the nurses about any medical concerns. (Dunaway Decl. Ex. 9, at 1, 2.) Moreover, Miller was arraigned that sane day, but there is no record he told anyone he was not feeling well or he needed emergency help. (Dunaway Decl. Ex. 17.) While he was housed in 5A, Miller did put in a MRF asking for Cymbalta, Norco and melatonin, but not for any heart medications. (Dunaway Decl. Ex. 11, at 5.)

Around 9:30 p.m., Miller arrived at the Inverness Jail, and by approximately 9:42 p.m. he was moved to Dorm 8 to be housed. (Dunaway Decl. Ex. 8, at 5, Ex. 16.) Before going to his dorm a deputy asked Miller if he had any medical problems or concerns, or if he needed medications. (Peterson Dec. ¶ 4; Dunaway Decl. Ex. 18.) At all times while a person is in custody in Multnomah County jails, he is entitled to emergency care and care for serious medical conditions. Moreover, the individual can report his need for care either to a deputy or a nurse. (Shah Decl. ¶ 7; Chesney Decl. ¶¶ 8-10; Peterson Decl. ¶¶ 2-3; Dunaway Ex. 11, at 6, 7.) Miller indicated he had medications, but he did not report any medical problems or concerns. (Peterson Dec. ¶ 4; Dunaway Decl. Ex. 18.) In fact, there is no report of Miller ever requesting a deputy or nurse for medical care in August of 2010. (Peterson Decl. 1 5; Ex. 8, p. 5) Nevertheless, sometime between 9:42 p.m. when Miller was placed in Dorm 8 and 11:30 p.m. when he became unconscious and stopped breathing, Miller did complete a MRF asking for "Norco for C[h]ronic Back Pain, Sleeping Pill, Heart Med." (Dunaway Decl. Ex. 11, at 4.)

At 11:30 p.m., inmates in Dorm 8 sleeping near Miller noticed he was snoring loudly and called a deputy over to his bunk. (Dunaway Ex. 6, at 1-2.) The deputy noticed Miller was not

responsive and, subsequently, was not breathing and did not have a pulse. (Dunaway Ex. 6, at 1-2.) The deputy called for medical backup. (Dunaway Ex. 6, at 1-2.)

That same night the individual defendants Sinclair, Armstrong, and Blasko – all three registered nurses – were working the evening shift at the Inverness Jail. (Jackie Sinclair Decl. ¶¶ 2-3, Aug. 26, 2013; Judy Armstrong Decl. ¶¶ 2-3, Aug. 26, 2013; Helen Blasko Decl. ¶¶ 2-3, Aug. 26, 2013.) Sinclair was the lead nurse who supervised staff, performed administrative tasks and provided medical backup, but did not have authority to promulgate policy, procedure or practices. (Sinclair Decl. ¶ 3.) Blasko and Armstrong worked in the dormitories where the inmates were housed, and their duties included picking up the MRFs in the early evening, changing wound dressings, taking vital signs, and responding to the immediate medical needs of inmates. (Armstrong Decl. ¶¶ 3-4; Blasko Decl. ¶¶ 3-4; Shah Decl. ¶ 8.)

At approximately 11:35 p.m. on August 4, 2010, the three nurses were in the medical area of the Inverness Jail when they heard a deputy asking for medical backup in Dorm 8. The three immediately headed toward Dorm 8. (Armstrong Decl. ¶ 5; Blasko Decl. ¶ 5; Sinclair Decl. ¶ 4.) Upon arrival, the nurses were directed toward the bunk where an inmate, later determined to be Miller, was experiencing a medical emergency. (Armstrong Decl. ¶ 6; Blasko Decl. ¶ 6; Sinclair Decl. ¶ 5.) According to the chart notes taken on August 4, 2010, Miller had no pulse or blood pressure during this time. The three nurses moved Miller onto the floor to render emergency medical assistance as a team. (Dunaway Decl. Ex. 5, at 4-5.) After assessing Miller, Sinclair instructed the deputies to call 911. (Armstrong Decl. ¶ 9; Blasko Decl. ¶ 9; Sinclair Decl. ¶ 8.) At the time in question, all three nurses were certified to perform Cardio Pulmonary Resuscitation ("CPR"). (Armstrong Decl. ¶ 8; Blasko Decl. ¶ 8; Sinclair Decl. ¶ 7.)

8 – FINDINGS AND RECOMMENDATION

Because Miller did not respond to the initial efforts by the nurses, *i.e.*, he remained unconscious, an Automatic External Defibrillator ("AED") was utilized and a shock was administered. Miller did not, however, regain a palpable pulse. The AED again analyzed Miller's condition and subsequently advised not to shock. (Armstrong Decl. ¶ 10; Blasko Decl. ¶ 10; Sinclair Decl. ¶ 9.) As such, the three nurses commenced CPR and were able to achieve a very faint pulse. At this point, the nurses attempted to re-employ the AED, but once again it advised no shock. Consequently, they resumed CPR until the paramedics arrived and took over Miller's care. (Armstrong Decl. ¶ 11; Blasko Decl. ¶ 11 Sinclair Decl. ¶ 10.) Miller was transported to PAH. Accordingly to their sworn statements, all three nurses insist that when Miller left the jail with the paramedics, he was breathing and had a pulse. (Armstrong Decl. ¶ 11; Blasko Decl. ¶ 11; Sinclair Decl. ¶ 10.)

Miller never regained consciousness and he died on August 6, 2010, after medical care was withdrawn. (Dunaway Decl. Ex.7.) The cause of death recorded by the hospital was anoxic brain injury, with complicating ventricular fibrillation, and complicating non-ST segment elevation myocardial infarction. (Dunaway Ex. 7, at 1.)

Dr. Joaquin Cigarroa, an experienced cardiologist and the County's expert witness,[1] reviewed

---

[1] A court deciding a summary judgment motion may rely on an expert opinion based upon the facts of the case and not on personal knowledge. *See Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1460 (9th Cir. 1988), *vacated by*, 490 U.S.1987 (1989), *reinstated on remand by*, 886 F.2d 235 (9th Cir. 1989) (because Rule 703 permits expert testimony to be based upon facts or data made known to an expert, which need not be admissible if it is of the type reasonably relied upon by experts in the field, expert witnesses are likewise permitted to base affidavits, for purposes of summary judgment, upon the same sources rather than upon personal knowledge). The expert report in this case relies on facts and data that are of a type reasonably relied upon by experts in the field and, therefore, is admissible. *Hamilton v. Silven, Schmeits & Vaughan*, No. 2:09-cv-1094-SI, 2013 WL 2318809, at *3-4 (D. Or. May 28, 2013).

9 – FINDINGS AND RECOMMENDATION

Miller's medical records from the time preceding and following Miller's stay at the jail; Miller's

medical records during his stay at the jail; and Miller's arrest records. (Cigarroa Decl. ¶¶ 3-22.) It

is Dr. Cigarroa's opinion that, to a reasonable medical certainty, Miller experienced what in medical

terms is called "sudden death". (Cigarroa Decl. ¶ 11.) More specifically, Miller, whose overall

health was poor, had severe hypokalemia and this condition led to ventricular fibrillation. (Cigarroa

Decl. ¶¶ 7, 13, 14, 16-22.) Hypokalemia is low potassium, an electrolyte necessary for the heart to

maintain a normal rhythm, without which the patient may suddenly experience an irregular rhythm

and the heart may be unable to pump blood to the rest of the body. (Cigarroa Decl. ¶¶ 18, 19.) The

PAH medical records documenting Miller's care after he was transported from jail to the hospital

show his potassium level ranged from 1.8 to 2.6, which are critically low levels of potassium.

(Cigarroa Decl. ¶ 17.) The initial report of Miller's potassium level upon his arrival to the PAH

emergency room following his cardiac event was 2.6, still within the moderate hypokalemia range.

(Berman Decl. Ex. 14.)

      In Dr. Cigarroa's opinion, nothing the County or the named individual defendants did or

failed to do contributed to Miller's death. (Cigarroa Decl. ¶¶ 20-22.) According to Dr. Cigarroa,

the only measure that may have prevented Miller's death was intravenous potassium; however, the

August PAH medical records and the jail medical records did not reveal any signs or reported

symptoms to prompt medical personnel to conduct a blood test to determine Miller's potassium

level. (Cigarroa Decl. ¶ 22). It is also Cigarroa's opinion that the failure to provide Miller his heart

medication, Toprol XL, neither contributed to nor would have prevented his death. (Cigarroa Decl.

¶¶ 5, 6, 21.)

Based upon a review of the medical records, Dr. Jeffery Young, Miller's expert, concluded Miller did not receive any Toprol XL during the 24-hour period he was in custody. (Young Decl. ¶ 3.) Further, in his Declaration Dr. Young stated: "Based on my review of the medical records, pharmaceutical literature and training, I believe to a medical probability that Mr. Miller['s] death was due to the abrupt cessation of his Toprol medication while in custody." (Young Decl. ¶ 6.) During his deposition, however, Dr. Young did acknowledge Toprol XL would not prevent ventricular fibrillation in someone with very low potassium levels, *i.e.*, a level of 1.8. (Dunaway Decl. Ex. 20 (Dr. Jeffery Young Dep. 60:14-61:11, 75:7-76:9, Aug. 5, 2013 (hereinafter "Young Dep.")).)

At all pertinent times, Gayle Burrow, Director of Corrections Health, was the person in the County who had authority and responsibility for promulgating policies, procedures, and practices for the Corrections Health Department. (Shah Decl. ¶ 2; Dunaway Decl. Ex. 12-14.) Pursuant to Multnomah County Corrections Health policies and procedures, which are in compliance with the standards of the National Commission on Corrections Health Care ("NCCHC"), all MRFs are triaged within 24 hour, but emergency care is available to inmates at all times. (Peterson Decl. ¶ 2; Shah Decl. ¶ 7; Chesney Decl. ¶¶ 3, 9-11, 13; Dunaway Decl. Exs. 10 and 11.) If Miller had asked for Toprol XL at booking or subsequently, or told jail staff he was not feeling well, he would have received Toprol XL, which is in stock at the jail. (Shah Decl. ¶ 8; Chesney Decl. ¶ 8.)

*Legal Standard*

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED R. CIV. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All material facts are

resolved in a light most favorable to the nonmoving party. *Id.* at 331. The court must accept all evidence and make all inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

*Discussion*

I.    42 U.S.C. § 1983

Deborah Miller alleges three claims under 42 U.S.C. § 1983 grounded in the actions taken, and not taken, while her husband was in the custody of the County. Section 1983 provides a private right of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege two essential elements: (1) a federal constitutional or statutory right was violated; and (2) the alleged violation was committed by a person acting under the color of state law. *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001). The County moves for summary judgment against each of these claims on the ground there is no evidence to establish any of the named defendants acted with deliberate indifference toward Ray Miller. Alternatively, no act or omission by defendants caused Miller's harm.

    A.    *Count One - Deliberate Indifference (Eighth and Fourteenth Amendments)*
    B.    *Count Two - Shocks the Conscience (Fourteenth Amendment)*

In her First Claim for Relief, Miller alleges the County violated the Eighth and Fourteenth Amendments when it subjected Ray Miller to cruel and unusual punishment by acting with deliberate indifference to his serious medical needs in certain enumerated ways. (Am. Compl. ¶¶ 17-19.) Specifically, Miller alleges Armstrong, Sinclair, and Blasko failed to properly evaluate, treat, house, monitor, and timely dispense medications to Miller. Miller also alleges in Count One the County

was deliberately indifferent because of its policies and practices for reviewing and processing MRFs, including the practice to not process MRFs from inmates during evening hours. (Am. Compl. ¶ 19.) The court will consider Miller's challenges to the County's policies and procedures in section I.C., below.

In her Second Claim for Relief, Miller alleges Armstrong's, Sinclair's and Blasko's conduct was so unreasonable and arbitrary as to shock the conscience and violate Ray Miller's rights under the Fourteenth Amendment. Miller further alleges the wrongful conduct taken by these individuals was due, in part, to established polices and practices of the County; and, the County is also liable because it ratified the conduct of these employees. (Am. Compl. ¶¶ 20-22.) Miller's challenges to the County's policies and practices will be considered in section I.C., below.

As a preliminary matter, the analysis for Miller's "Deliberate Indifference" (Count One) and "Shocks the Conscience" (Count Two) claims is identical as "deliberate indifference" is simply a subset of "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). In *County of Sacramento v. Lewis*, the Supreme Court clarified that only official conduct that "shocks the conscience" and violates the "decencies of civilized conduct" is cognizable as a due process violation. 523 U.S. 833, 846-47 (1998). The relevant question after *Lewis* is whether a "shocks the conscience" standard is met by showing the official acted with "deliberate indifference" or whether the more demanding showing of an "intent to harm" is required. *Id*. at 853-54. The assessment of what constitutes conscience-shocking behavior differs according to the factual setting. For example, in the prison setting, the opportunity for deliberation likely makes the test more easily satisfied than in the setting of a police chase. The latter is a rapidly evolving situation requiring immediate responses from officials and, consequently, there can be no liability without an "intent to harm

suspects physically or to worsen their legal plight." *Lewis*, 523 U.S. at 854. Under subsequent case law, the Ninth Circuit has distinguished the "purpose to harm" standard from the "deliberate indifference" standard, while recognizing the overarching test under either is whether the officer's conduct "shocks the conscience." *Porter*, 546 F.3d at 1137. Thus, the relevant question here is whether Miller has produced evidence to show the prison officials' conduct was deliberately indifferent to Ray Miller's serious medical needs such that, under community standards, the behavior shocks the conscience.

Although Miller alleges violations of both the Eighth and Fourteenth Amendments, her claim for failure to provide care for the serious medical needs of her husband is analyzed under the substantive due process clause of the Fourteenth Amendment. *See Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir. 2002) ("Because Gibson had not been convicted of a crime, but had only been arrested, his rights derive from the due process clause rather than the Eighth Amendment's protection against cruel and unusual punishment."). Nevertheless, the same standards are applied, requiring proof defendant acted with "deliberate indifference." *See Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) ("Because pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment . . . we apply the same standards.").

In the Ninth Circuit, to show deliberate indifference toward a medical need, plaintiffs must show: (1) a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain[;]'" and (2) defendant's response to the need was deliberately indifferent. *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1991) (*quoting Estelle v. Gamble*, 429 U.S. 97, 104 (1976), *overruled on*

14 – FINDINGS AND RECOMMENDATION

*other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (*en banc*). The second prong – defendant's response to the need was deliberately indifferent – is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need; and (b) harm caused by the indifference. *Id.* Indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* at 1059. Nevertheless, an "inadvertent [or negligent] failure to provide adequate medical care" alone does not state a claim under § 1983. *Id.*

With respect to Miller's Fourteenth Amendment claim against the named individuals – Sinclair, Armstrong, and Blasko – the court turns to the first prong of the deliberate indifference analysis; namely, whether there was a serious medical need. Miller presents evidence her husband had an "emerging heart condition" that required daily medication, Toprol XL. (Young Decl. ¶ 2; Alsdorf Decl. ¶ 2.). This evidence satisfies the first prong of Miller's claim for deliberate indifference. *See McGuckin*, 974 F.2d at 1059-60 ("[T]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment.")

With respect to the second prong, Miller must present some evidence in support of her claim that each of the named defendants "[knew] of and disregard[ed] an excessive risk to [plaintiff's] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v.*

*Brennan*, 511 U.S. 825, 837 (1994). It is not enough that plaintiff had serious medical needs which were disregarded. There must be some facts alleged demonstrating that each defendant involved knowingly disregarded an excessive risk to plaintiff's health. The question, then, is whether Miller presented evidence from which a reasonable jury could conclude that each of the named individuals knew of and were deliberately indifferent to this substantial risk of serious harm Miller faced if not properly treated.

Miller offers her sworn statement that she spoke, by phone, with "corrections officials Melleck, Heidenreich and later others, at about 9:00 a.m. on August 4, 2010[,]" to inform them her husband "desperately needed his heart medications[.]" (Miller Decl. ¶ 7.) According to her statement, a corrections official called Deborah Miller "that afternoon to reassure [her] . . . they were investigating his medications." (Miller Decl. ¶ 7.) In addition, Deborah Miller stated in her deposition that her husband called her from jail to ask about his heart medication and whether Deborah told anyone about the medication. (Miller Dep. 48:1-7.) Deborah Miller testified that during the same phone call Miller stated to her: "he told them that he needed his heart medication." (Miller Dep. 48:3-4.) The transcript from that call does not support these allegations by Deborah Miller. (Dunaway Decl. Ex. 21.) Finally, Miller presented some evidence her husband requested his "heart meds" the evening of August 4, 2010, yet there is no evidence of any inquiry for those medications. (Alsdorf Decl. ¶ 14.)

The court observes that much of Miller's evidence is derived from her declaration and deposition testimony. The Ninth Circuit has held that "[s]pecific testimony by a single declarant can create a triable issue of fact," but that a court "need not find a genuine issue of fact if, in its

determination, the particular declaration was 'uncorroborated and self-serving.' " *FTC v. Neovi*, 604 F.3d 1150, 1159 (9th Cir. 2010) (subsequent amendments incorporated). In *S.E.C. v. Phan*, 500 F.3d 895, 909-10 (9th Cir. 2007), however, the Ninth Circuit held self-serving declarations can create a genuine issue of material fact, and courts can disregard a self-serving and uncorroborated declaration only in certain instances, such as when the declaration is conclusory or is based on facts beyond the declarant's personal knowledge. Although, Deborah Miller is testifying directly about specific details of a conversation with her husband, neither the transcript from the call nor the County's phone logs support Miller's version of the events. In fact, Miller's version of the events is directly contradicted by the record. Further, there is allegation by Miller, or any other evidence in the record, to suggest the phone log and transcript do not accurately reflect the telephone conversation(s) between Miller and her husband. In analyzing a Rule 56 motion, the court is required to draw reasonable inferences in favor of the non-moving party; it need not, however, construe the record in such a manner that is wholly unsupported by the record. Indeed, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Any reasonable juror will rely upon the objective and contemporaneously documented phone log and transcript, rather than a single recollection provided three years after the event. Miller failed to present evidence from which a jury could conclude Sinclair, Blasko, and Armstrong knew of Ray Miller's serious medical need.

Even if Miller could show the three nurses knew of her husband's serious medical need, she must also come forth with some evidence these three individuals were deliberately indifferent to her

husband's serious condition.  As set forth above, a showing of deliberate indifference can be is satisfied by evidence of:  (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need; and (b) harm caused by the indifference.  *McGuckin*, 974 F.2d at 1059-60.  For purposes of this motion only, the court will assume without deciding Miller has met her burden with respect to the first prong – evidence of a purposeful act or a failure to respond.  Consequently, the court turns to the evidence of whether the acts or omissions of the named individuals caused the harm to Ray Miller.

There is no dispute Ray Miller suffered harm in this case.  The evidence, however, is unequivocal that his harm was not caused by the alleged failures of nurses Sinclair, Blasko, and Armstrong.  Both Miller's and the County's medical experts agree Ray Miller's death resulted from fatally low levels of potassium and not the abrupt cessation of the Toprol XL.  Indeed, Miller's medical expert, Dr. Young, testified:

> Q.    How quickly. does Toprol work?  Is it immediate, 15 minutes, an hour, depends?
>
> A     Yeah.  I mean , it depends on if you chew it, if you swallow it with a bunch of food, if you take it on an empty stomach.  I would have to look at the actual – I mean, I guess I could guesstimate a half hour, 45 minutes.
>
> Q.    And is it your opinion that the Toprol would have prevented the V-fib?
>
> A.    Given the knowledge that I had at the time of that and not knowing the – these chemistry profiles and such only after the fact that I made this statement, yes.
>
> Q.    It would have prevented the V-fib?
>
> A.    Well, I mean, nothing's perfect, but nobody can say that a hundred percent. What I can say is that it would have helped keep it from occurring.

Q. Well, would it have helped given the potassium readings that he had afterwards, which ranged as low as 1.8?

A. No.

Q. So if he was on the Toprol but his potassium reading was severely low, and one of the reads on 8/5 is 1.8, would the Toprol have prevented the V-fib?

A. No.

. . . .

Q. And I know we're running way over, so I'm going to be pretty quick on this one. Just to identify the 9 record that is now marked Exhibit 9, this is Portland Adventist records of your care of Ray Miller on August 5th, 2010 and August 6, 2010. Can you turn to the record that is marked 000167, and where it states laboratory data, could you read what Mr. Miller's potassium level was on 8/5?

A. 2.6.

Q. And then can you go to 00007 –

A. Okay. I see.

Q. – and read into the record what Mr. Miller's potassium level is on that test?

A. 2.4.

Q. And a few hours later, can you read on page 0008 what Mr. Miller's potassium level was?

A. 2.2.

Q. And then on 0009, can you read what Mr. Miller's potassium level was on 8/5, 2010 at about 12:25?

A. 1.8.

Q. Okay. Having potassium levels at those – in that range, what effect does that have on the heart?

19 – FINDINGS AND RECOMMENDATION

A.      Again, it's – the heart is unable to beat on its own.  It would be in ventricular
         fibrillation or asystole.

Q.      And could the prescription Toprol have prevented V-fib if the potassium
         levels are that low?

A.      No.

(Duaway Decl. Ex. 20 (Dr. Jeffery Young Dep. 60:20-61:11, 75:7-76:9, Aug. 5, 2013).)

Additionally, Dr. Cigarroa, the County's medical expert, stated unequivocally that the failure

to administer Toprol XL to Ray Miller did not precipitate or cause his death.  Dr. Cigarroa stated;

"Even if Mr. Miller had received his Toprol XL on August 4th while in Jail, Mr. Miller would still

have had ventricular fibrillation on August 4th because this condition was caused by Mr. Miller's

hypokalemia, not by the fact that he had not taken Toprol that day."  (Cigarroa Decl. ¶ 21, *see also*

¶ 21  ("To a reasonable medical certainty, it is my opinion as a cardiologist that the fact that Mr.

Miller did not receive Toprol XL, or any other beta blocker, while he was in jail was not the cause

of Mr. Miller's death.").)  The two medical experts agree that ventricular fibrillation brought about

by hypokalemia comes without warning.  (Young Dep. 40:1-22; Cigarroa Decl.¶¶ 20, 23.)  Finally,

Miller acknowledges in her Response Brief:  "the facts are undisputed that the cause of [Ray]

Miller's death was ventricular fibrillation *caused by hypokalemia due to non delivery of kdur*[sic]

*and likely Toprol*." (Pl.'s Resp. 14 (emphasis added).)

The court is aware Dr. Young's preliminary statements in his declaration[2] indicated the

---

[2]In fact, the County requests this court strike "Dr. Young's May 13th expert opinion
regarding cause of death."  (Defs.' Reply 3.).  "The general rule in the Ninth Circuit is that a
party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."
*Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  Before striking an
affidavit, a district court must make a factual determination that the contradiction was actually a
"sham," created for the purpose of generating a material issue of fact to preclude summary
judgment. *Id.* at 267; *accord Too Marker Products, Inc. v. Shinhan Art Materials, Inc.*, No. 09-

abrupt cessation of the Toprol XL was the cause of death in this case.  Subsequently, after a more complete review of the record, including Ray Miller's chemistry profiles from the day of death, Dr. Young concluded instead that the Toprol XL would not have prevented ventricular fibrillation, the precipitating cause of death, for Ray Miller.  Dr. Young's deposition testimony had the benefit  a more complete review of the medical evidence, provided an unedited opinion in his own words, included an opportunity to elaborate, explain and defend his conclusions.  In addition, counsel on both sides were present and able to question Dr. Young regarding his expert medical opinion. Significantly, Miller does not challenge Dr. Young's subsequent conclusion regarding cause of death.    Consequently, the contemporary medical evidence in the record before the court is conclusive:  the alleged failure to administer Toprol XL did not harm Ray Miller on August 4th. Indeed, when presented with medical expert testimony on both sides that Ray Miller died as a result of his critically low potassium levels, no reasonable jury could conclude it was a failure to administer the Toprol XL that precipitated Miller's death.[3]

---

cv-1013-PK, 2010 WL 4781531 (D. Or. 2010).  Here, Dr. Young's statement in his declaration was prior to his deposition testimony.  In fact, Dr. Young's deposition testimony was made after he was fully informed of the circumstances around Ray Miller's death and helped to clarify his earlier statement regarding cause of death in his declaration. *See Too Marker*, 2010 WL 4781531 at *2 (declaration was submitted months before deposition, precluding possibility declaration was manufactured solely to preclude summary judgment).  Thus, Dr. Young's declaration statements are not "sham" and the request to strike them is denied.

[3]Miller did produce a declaration from Shasha Alsdorf, R.N.  Nurse Alsdorf stated it was her medical opinion Miller's "death was due to the abrupt cessation of his Toprol medication while in custody."  (Shasha Alsdorf Decl. ¶ 16, May 13, 2013.)  Under Oregon law, Nurse Alsdorf is not qualified to render an expert opinion as to cause of death. *See, e.g.,* OR. REV. STAT. § 432.133("A medical certification shall be completed within 48 hours after having access to the report of death by the decedent's primary or attending medical certifier who was in charge of the care of the patient for the illness or condition that resulted in death . . . ."); § 432.005(22) ("'Medical certifier' means a physician, physician assistant or nurse practitioner licensed under the laws of this state or under the laws of Washington, Idaho or California who has treated a

Miller can show no harm resulting from the absence of medication and, thus, she is unable to establish deliberate indifference by the County. Accordingly, Miller is unable as a matter of law to sustain a claim for denial of medical care under the Fourteenth Amendment. The County's request for summary judgment against Miller's First Claim for Relief – Eighth Amendment (Unreasonable Denial of Medical Care and Treatment); and the Second Claim for Relief (Unreasonable/Arbitrary Conduct that Shocks the Conscience) should be granted.

C.    *Count Six - Monell Liability (Eighth Amendment)*

In her Sixth Claim for Relief, Miller alleges a claim for a deprivation of Ray Miller's Fourteenth Amendment[4] rights resulting from jail health policies that delay after-hours medical request processing until the following day. (Am. Compl. ¶¶ 37-38.) Miller asserts this claim pursuant to the Supreme Court's decision in *Monell v. Department of Social Services,* 436 U.S. 658 (1978). In *Monell*, the Court held a municipality may be liable under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. Nevertheless, a "municipality cannot be held liable under § 1983 on a *respondeat superior* theory. *Id.* at 691. In this case, Miller alleges Dr. Amit Shah is the final policy maker for purposes of municipal liability under § 1983. (Am. Compl. ¶ 38.) The County, however, presented uncontroverted evidence that

_____

decedent within the 12 months preceding death.") Moreover, Nurse Alsdorf did not establish any qualifications as a cardiac nurse, it is unclear whether she reviewed Ray Miller's chemistry profile at the time of death, and she never treated Miller.

[4]As explained above, because Miller was a pretrial detainee his constitutional claims must be analyzed under the substantive due process clause of the Fourteenth Amendment rather than the Eighth Amendment.

in fact it is Gayle Burrow who is responsible for promulgating policies, procedures, and practices for the Corrections Health Department. (Shah Decl. ¶ 2; Dunaway Decl. Ex. 12-14.)

Four elements must be established to impose liability on a local government entity under *Monell*. A plaintiff must prove: (1) he was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

As a general rule, there can be no basis for *Monell* liability in the absence of a showing the individual acted pursuant to a policy *and* violated plaintiff's constitutional rights. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." (Emphasis in original)); *accord Scott v. Heinrich*, 39 F.3d 912, 916 (9th Cir. 1994) ("Here, the municipal defendants cannot be held liable because no constitutional violation occurred."). Nevertheless, both the Supreme Court and the Ninth Circuit have determined municipal liability may attach in the absence of an underlying constitutional violation by an individual state actor in instances where the failure to train amounts to deliberate indifference to the rights of the person with whom the state actor comes into contact. *Cit of Canton v. Harris*, 489 U.S. 378, 388 (1989), *abrogated in part on other grounds by Farmer*, 511 U.S. 825; *see also Gibson*, 290 F.3d at 1186 n.7 (recognizing exceptions to the proposition that if individual actors are absolved of liability, municipality cannot be held responsible); *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002) (The city could be liable

"for improper training or improper procedure even if the individual officer charged with violating the plaintiff's constitutional rights was exonerated."). The unifying policy driving these decisions is to provide plaintiffs who suffer a constitutional violation an avenue for relief in instances were the individual actor is exonerated.

Here, the individual nurses' training or lack of training, or the County's training policies did not cause Miller's harm and, consequently, the County cannot be liable under *Monell* for the nurses' actions taken pursuant to County policies, including the decision to process the request for Toprol XL the following day. This is not a case in which defendants were entitled to qualified immunity, or plaintiff was unable to ascribe the wrongful conduct to particular individuals, or the wrongful conduct occurred prior to the actions of the named defendants. *Gibson*, 290 F.3d at 1186 n.7 (cases cited therein). Instead, the facts of this case fall squarely under the Supreme Court's decision in *Heller*. Miller alleges the death of her husband was due to the County's policy of "delaying after-hours MRF processing to the next business day, imperiling decedent and inmates in county custody." (Am. Compl. ¶ 38.) As set forth above, the court determined the County did not violate Ray Miller's constitutional rights by failing to administer Toprol XL in a timely fashion. Similar to the circumstances in *Heller*, the fact County Policies *may* have been unconstitutional is irrelevant because there is no constitutional injury at the hands of the individuals. *Heller*, 475 U.S. at 799. Miller cannot prevail on her *Monell* claim as a matter of law. Accordingly, the County's request for summary judgment against Miller's Sixth Claim for Relief (Monell Violation) should be granted.

II.    State Law Claims

A district court may decline to exercise supplemental jurisdiction over state-law claims if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. 1367(c)(3). Moreover,

24 – FINDINGS AND RECOMMENDATION

when a district court dismisses all federal-law claims before trial, "the balance of the factors balance to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (*en banc*); *see, e.g., Crane v. Allen*, No. 3:09-cv-1303-HZ, 2012 WL 602432, at *10 (D. Or. Feb. 22, 2012) ("Having resolved all claims over which it had original jurisdiction, this court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.").

In addition, the factors of judicial economy, convenience and fairness weigh in favor of this court declining to exercise supplemental jurisdiction. State court is a convenient forum for the parties, and declining to exercise supplemental jurisdiction respects the values of federalism and comity. There is no purpose to be served by this court exercising supplemental jurisdiction over the state law claims and the court declines to do so. Accordingly, Miller's state-law claims should be dismissed, without prejudice, and with leave to refile those claims in state court.

III.    Motion to Amend Complaint

    A.    *Background*

Miller seeks leave to file a Second Amended Complaint to allege "the denial of either or both Toprol and Kdur" caused Ray Miller's death. (Pl.'s Resp. 14.) Miller filed this action on September 27, 2011. The initial Scheduling Order issued October 4, 2011, and required Miller to join all claims, remedies, and parties by February 1, 2012, which date also served as the close of discovery date. Over two months later, on November 29, 2011, Miller issued the Summons to Multnomah County Counsel, thereby serving only one of the parties named in the Complaint. The County filed

a timely Answer. On February 8, 2012, over four months after filing the Complaint, Miller had not served the remaining six defendants in this case. Based upon this failure to prosecute her case, the court issued and Order to Show Cause directing Miller either to serve the remaining parties or face dismissal of those parties from this action.

Thereafter, Miller effected service on Sinclair, Blasko and Armstrong, but still had not served the two corporate defendants named in her Complaint, Maxim Healthcare Services, Inc. and Maxim Health Systems, LLC. In addition, by this time the initial deadlines set by the court for to prosecute her case had passed. Consequently, the court Ordered Miller's counsel to appear in person on March 22, 2012, and explain his failure to serve the two corporate defendants. On March 13, 2012, Miller filed a Motion to Dismiss those two defendants and the court entered Judgment accordingly.

Six months after filing the Complaint, all defendants were served and the court converted the Order to Show Cause hearing set for March 22, 2013, to a Rule 16 Conference, at which it set new deadlines. During the Rule 16 Conference the court also set September 24, 2012, as the deadline for discovery and also ordered dispositive motions to be filed by October 24, 2012. Miller also was allowed fo file and Amended Complaint, due no later than March 30, 2012. Miller filed the Amended Complaint late, on April 5, 2012.

On September 14, 2014, one year after filing the case, Miller filed a Motion for Extension of Discovery Deadlines in which she requested an additional 120-day extension of the discovery and dispositive motions deadlines, which the court granted. The new schedule required discovery to be completed by January 22, 2013, and dispositive motions filed by February 22, 2013. Three months later, in response to a request by Miller, the court set a Discovery Conference for December 14,

2012. At that time the court addressed both parties' concerns regarding discovery issues and set a final discovery deadline for March 29, 2013, and a dispositive motion deadline of April 29, 2013. Nevertheless, on March 25, 2013, Miller filed a Motion for Extension of Discovery Deadlines requesting the dispositive motion deadline be reset to June 15, 2013. The court granted an extension of that deadline until May 22, 2013.

On April 29, 2013, one month after discovery closed, 19 months after filing this lawsuit, and less than a month before the dispositive motion deadline, Miller filed an Amended Motion for Leave to Amend seeking leave to file a Second Amended Complaint. Miller's proposed Second Amended Complaint did not include any allegations regarding potassium or K-Dur or hypokalemia. On May 23, 2013, the court held a hearing and denied, as untimely, Miller's request to file a Seconded Amended Complaint. Once again though, the court extend the deadlines for prosecution of this case. The parties were ordered to complete Initial Expert Disclosures by June 24, 2013, with the depositions of those experts to be concluded by August 9, 2013; dispositive motions were due by August 26, 2013, almost two years after the original Complaint was filed. Three days prior to the deadline Miller requested an extension of the expert discovery deadline, which the court denied; and ten days prior to the dispositive motions deadline, Miller requested 45 additional days to file a dispositive motion in this case, which the court also denied. In accordance with the court's deadline, all defendants filed a Motion for Summary Judgment on August 26, 2013. Miller filed her Response on September 30, 2013, and for the first time – two years after filing her lawsuit – she proposed to include allegations Ray Miller's potassium deficit as either the cause or contributing cause of his death.

B.    *Legal Standard*

After the initial pleading stage, a plaintiff may amend his "pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  FED. R. CIV. P. 15(a) (2013).  "Although the rule should be interpreted with extreme liberality, leave to amend should not be granted automatically."  *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990) (quotations and citation omitted).  A trial court may deny the motion if permitting amendment would prejudice the opposing party, produce an undue delay in litigation, result in futility for lack of merit, is sought by plaintiffs in bad faith or with a dilatory motive, or the plaintiffs have filed numerous amended complaints.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987).  Prejudice to the opposing party carries the "greatest weight" in determining whether to deny leave to amend.  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).  Whether to grant leave to amend lies within the sound discretion of the trial court.  *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981).  In exercising this discretion, however, the court "must be guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities."  *Id.*

C.    *Discussion*

Miller never filed a Motion to Amend, including a copy of the proposed Amended Complaint.  *See* L.R. 15(d)(1) ("A copy of the proposed amended pleading must be attached as an exhibit to any motion for leave to file the amended pleading.")  Rather, Miller's request is before the court on a single statement in Miller's Response to the Motion for Summary Judgment:  "At a minimum, plaintiff should be allowed to amend her complaint to reflect the claim that denial of either or both Toprol and Kdur led to the demise of the decedent Ray. A. Miller." (Pl.'s Resp. 14.)

28 – FINDINGS AND RECOMMENDATION

The information about hypokalemia and its role in Miller's death has been available from the inception of this litigation. Indeed, the August 5, 2010, PAH medical records on Ray Miller state: "Cause of Death: Anoxic brain injury, complicating ventricular fibrillation, and complicating non-ST segment elevation myocardial infarction." (Dunaway Decl. Ex. 7 at 1.) In addition, under "Diagnosis Code & Description" there is an entry indicating the presence of "hypopotassemia." (Dunaway Decl. Ex. 7 at 2.) The PAH medical records for the care of Miller after he was transported from jail to the hospital show his potassium level ranged from 1.8 to 2.6, which are critically low levels of potassium. (Dunaway Decl. Ex. 7; Cigarroa Decl. ¶ 17.) The PAH records were neither in defendants' custody nor otherwise withheld from Miller. Certainly, she either knew or should have known from the outset about her husband's potassium levels and the role his critically low levels might have played in his death. Thus, the information regarding Miller's potassium levels at the time of his death have been available to Miller throughout this litigation; it is not a newly discovered fact. Miller's decision to not include these allegations in either of her two previously filed Complaints goes unexplained. The court is left to assume either it was a tactical choice by counsel or a failure to recognize the issue, neither of which provides a basis for filing a Second Amended Complaint at this juncture. On the record before the court the sole reason for Miller's delay in asserting these allegations is to avoid summary judgment based upon facts she has know for at least two years. That is insufficient reason to excuse such a lengthy delay. *See, e.g., AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 953 (9th Cir. 2006) (15-month delay was unreasonable where "moving party knew or should have known the facts and theories raised by the amendment in the original pleading")

29 – FINDINGS AND RECOMMENDATION

Additionally, allowing Miller to file a Second Amended Complaint at this juncture is prejudicial to the County and the individual defendants. Discovery closed after numerous extensions, all of which where requested by Miller. Miller's Amended Complaint was the road map for the parties' discovery: documents were requested and exchanged, and witnesses were deposed. The County requested and should be granted summary judgment against the federal claims in Miller's Amended Complaint, thereby resulting in dismissal of this case from federal court. Allowing Miller to Amend her Complaint now will effectively take this litigation back to the start, requiring both new discovery periods and dispositive motions, both costly for the County. *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d, 1149, 1160 (9th Cir. 1989) (leave to amend need not be granted where amendment of the complaint would cause the opposing party undue prejudice or create undue delay). In addition, the evidence in the record is that Miller's physician had discontinued his potassium due to gastrointestinal concerns and the only medical intervention that *may* have prevented Miller's death was intravenous potassium.

In sum, Miller's lone statement in his Response Brief seeking to amend his complaint to add allegations of potassium deficit fails to meet the controlling standard. Her delay is extraordinary and unexplained, she seeks to add a new theory to prevent an unfavorable dispositive motion ruling, and if allowed her amendment will prejudice the County and individuals and cause unnecessary delay. Accordingly, the court exercises its discretion and recommends Miller's request for leave to amend be denied.

*Recommendation*

For the reasons set forth above, the County's Motion for Summary Judgment (ECF No. 71) should be GRANTED, and Miller's Amended Complaint (ECF No. 19) should be DISMISSED, with prejudice.

*Scheduling Order*

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due April 14, 2015. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 31/st day of March 2015

John V. Acosta
United States Magistrate Judge

31 – FINDINGS AND RECOMMENDATION